IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PATRICK DEMARCAD PRYCE,

      Plaintiff,

v.                                         CIV 05-1021 MCA/KBM

ALLEN COOPER, Warden,
Cibola County Correctional Center, et al.,

      Defendants.

# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

This is a prisoner civil rights matter under § 1983, and the case is before the Court on numerous motions.  Having scrupulously reviewed the voluminous and disorganized record, I recommend that the Court not address whether any nonexhausted claims should be dismissed and instead find that all claims Plaintiff raises or seeks to raise should be dismissed on the merits.

## I.  Overview

Plaintiff is a Jamaican citizen and a federal prisoner who was convicted of illegal reentry in the United States District Court for the Northern District of

Georgia.  Pryce was sentenced to eighty-four months imprisonment and three years of supervised release in April 2003, and his projected release date is April 2009.  He has not adjusted well to incarceration.

For example, when he was incarcerated in Georgia, Pryce filed suit alleging that he was harassed, threatened, beaten and denied medical care at a county jail in Georgia because of his Jamaican ethnicity and status as a resident of New York City.[1]  When he was transferred to Cibola County Correctional Center ("CCCC") in New Mexico in December 2004, he continued a steady stream of the same sorts of allegations.  During the course of this litigation, the Court had to entertain a nonmeritorious motion by Plaintiff for a temporary restraining order.  *See Docs. 62, 75.*  In November 2006, he was transferred to a federal facility in California.[2]

This suit, the only one that remains pending in this District,[3] involves

---

[1] As of March 5, 2007, his § 1983 suit in Georgia, "1:04-cv-02012-CC," is still pending. The docket sheets and documents for that case are available to this Court electronically via CM/ECF.  His release date is available through the Bureau of Prisons website.  *See also Doc. 33* at 1-2 & n.1.

[2] Although he recently informed the Court that he intends to bring other litigation, it is not clear where that will be filed or the nature of the claims.  *See Doc. 87.*

[3] He also filed grievances concerning denial of a proper religious diet for Rastafarianism or Muslims, and it is not clear which religion he practices.  While copies of some of the "religion" grievances have found their way into this case, they are subject to the separate, consolidated actions being handled by Judges Herrera and Garcia.  Those cases were dismissed in October 2006 under the "total exhaustion" rule.  *See Pryce v. Cooper,* CIV 06-18 JH/LFG.

Plaintiff's allegations that throughout the entire time he was housed in New Mexico, defendants failed to provide adequate medical care and engaged in retaliatory behavior.  Pryce asserts that the motivation behind the conduct is racial discrimination and believes that the medical care he received caused his two heart attacks in March 2005 and April 2006.  He seeks millions of dollars in damages. *See, e.g., Docs. 1, 80.*

Defendants have renewed their motion to dismiss for lack of exhaustion and ask that several of Plaintiff's claims be dismissed in light of the recent Supreme Court decision in *Jones v. Bock,* 127 S. Ct. 910, 2007 WL 135890 (2007).  *See Docs. 77, 84.*  Also pending is their *Martinez* Report and motion for summary judgment on the merits.  *See Docs. 46, 47.*  Plaintiff has filed three motions to amend, as well as numerous other motions.  *See Docs. 26, 27, 80, 88-92.*

## II.  Eighth Motion For Appointment Of Counsel

Plaintiff filed his third motion to amend in January 2007.  *See Doc. 80.*  In one of his recent motions, he now states that he has been advised by a "prisoner who is a prior civil attorney" that there are "deficiencies" in his request to amend.  *Doc. 91 at 3.*  Pryce acknowledges that it would be "futil[e]" to continue "at this particular stage of these proceedings," and therefore seeks "withdrawal or concession of the

dismissal" of the motion to amend.  *Id.*

This pleading, as well as his other four recent motions, reflect the advice Plaintiff is evidently receiving from this inmate lawyer.  *See Docs. 88-92.* Nevertheless, for the eighth time he again requests appointment of counsel, *Doc. 88,* despite my previous warnings that sanctions could be imposed if he continued to file such motions with this Court.  *See Docs. 33, 36, 50.*  Pryce's circumstances have not changed.  Indeed, all of his abundant *pro se* pleadings reflect a continued ability to represent himself.  Therefore, I recommend that his request again be denied and that as a sanction, Judge Armijo order any further motions to appoint counsel by Plaintiff be stricken from the record.

### III.  Clarification Of Defendants & Capacities

The seven Defendants named in the Complaint are Warden Allen Cooper, Associate Warden Don Russell, Executive Assistant Matthew Carpenter, Special Investigator Chris Lucero, prison physician Donald Lacy, former Health Services Administrator Carolyn Klinker, and nurse Arnold Chavez.  *See Doc. 1.*  Pryce seeks to add Corrections Officer Larry Burbanks, Licensed Practical Nurse Margaret Roberts, and "Commander Quintana." *See Docs 26, 27, 80.*

Plaintiff filed a motion to clarify that each defendant is named in his or her

4

individual capacity, fearing that he inadvertently failed to do so in his complaint.
*See Doc. 92.*  Indeed, the Complaint mentions only that defendants acted under
color of law because they acted in their "official capacity," but did not specifically
mention individual capacity.  *Doc. 1* at 2.  Nevertheless, because of the demand for
damages from defendants, this Court has liberally-construed the Complaint as
raising both official and individual capacity claims.[4]  Accordingly, I recommend that
Pryce's motion to clarify be denied as moot.

Plaintiff also filed a motion asking the Court to construe the original
Complaint as raising a claim against Officer Burbanks.  *Doc. 90.*  This motion is
moot as well, in light of his motion to amend to add the officer and the Court's
discussion below.  I recommend that it be dismissed as such.

## IV.  Claims Under Consideration

### A.  Further Supplementation Should Be Denied

All of the many pleadings and attachments filed by Plaintiff that are relevant
to resolving this matter contain "complaints" about some aspect of his two-year stay

---

[4]  *See, e.g., Trackwell v. U.S. Government,* 472 F.3d 1242, 1244 (10th Cir. 2007) ("When, as
here, 'the complaint fails to specify the capacity in which the government official is sued, we look
to the substance of the pleadings and the course of the proceedings in order to determine whether
the suit is for individual or official liability.' *Pride v. Does,* 997 F.2d 712, 715 (10th Cir. 1993).
Mr. Trackwell has not sought damages. . . .   Accordingly, we construe Mr. Trackwell's claim
against the Clerk as an official-capacity claim.").

at CCCC.  Pryce asks permission to file even more supplemental materials to apprise the Court of "certain events, or other occurrences [that] have transpired since Petitioner's original Complaint was filed with the District Court." *Doc. 89* at 1.  He does not seek to amend the Complaint with the purported supplements, however, though it is plain that he knows how to do so.  Rather, he states that the materials are "directly related to the first sequences of constitutional violations," which I read as meaning those alleged in the Complaint.

The *Martinez* Report is huge.  It covers all of Plaintiff's medical records during his incarceration in New Mexico and contains others from his prior incarceration.  The submissions Plaintiff has already filed are themselves voluminous and repetitive.  Since he is not seeking permission to amend the Complaint, I recommend that this request be denied.

### B.  Claims Arise Under Eight And Fourteenth Amendments

Although Plaintiff lumps together a number of different legal theories of recovery, I categorize and analyze his claims into the proper legal theories based on the facts he asserts.  *See, e.g., Roman-Nose v.  New Mexico Dept. of Human Servs.,* 967 F.2d 435, 437 (10th Cir. 1992); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).  Consequently, I construe Plaintiff's pleadings as asserting denial of proper

medical care in violation of the Eighth Amendment and claims of retaliation in violation of the Fourteenth Amendment.[5]

Defendants recently noted that they are "federal" and not "state" actors. However, they acknowledge that the analysis of the merits of the constitutional claims is the same, regardless of whether Plaintiff's claims arise under § 1983 or *Bivens.  See Doc. 46* at 18-19; *see also e.g., Wilson v. Layne,* 526 U.S. 603, 609 (1999)(analysis); *Peoples v. CCA Detention Centers*, 449 F.3d 1097 (10th Cir. 2006), *cert. denied,* 127 S. Ct. 664 and 127 S. Ct. 687 (2006) (jurisdiction); *Melton v. City of Oklahoma City,* 879 F.2d 706, 728 n. 34 (1989) (analysis), *rev'd in part on other grounds,* 928 F.2d 920 (10th Cir. 1991).

## C.  Ten Claims

Either as previously identified by the Court and/or as raised in his last motion to amend, Plaintiff raises ten claims.  In chronological order they are:

**1.  Comment After Inquiring About Phlebotomist Gloves.**  Plaintiff contends that when he asked why gloves were not used to take blood from inmates,

---

[5] Plaintiff's Complaint characterizes his medical claim is "poor medical treatment, malpractice, Cruel and unusual punishment, and Discrimination in violation of the Eight and Fourteenth Amendment, Equal protection clause of the United States Constitution.  Also Deliberate indifference to serious medical needs."  *Doc. 1* at 3 (continued on additional pages to Complaint labeled "'D Cause of Action'" at page 1).  His one-word assertion for the second claim is simply "retaliation," *Doc. 1* at 3, although elsewhere he refers to such conduct as a discriminatory or a violation of equal protection, *see e.g., id.* (additional pages to Complaint labeled "'G Request for Relief'" at pages 1-2), or a violation of his First Amendment Rights, *see, e.g., Doc. 27* at 3.

Defendant Chavez said:  "'I don't need to take your blood and you need to get the f*** out of here, we don't need your kind around here.'"  *Doc. 1* (additional pages to Complaint labeled "'D Cause of Action'" at page 4).

      **2.  Misdiagnosis of Bloodwork In January 2005.**  Plaintiff asserts that after initially being informed by Defendants Lacy and Russell that certain blood test results were "too high," Dr. Lacy then informed him that his tests were normal and not cause for concern.  *Id.* (additional pages to Complaint labeled "'D Cause of Action'" at pages 1-2).  Thereafter, Plaintiff suffered a heart attack.  Pryce contends that the "inpropper (sic) diagnosis of plaintiff's blood test" by Defendants Russell, Lacy and Klinker "was malpractice; causing plaintiff to be unaware of serious problems with his health, which resulted in plaintiff's heart attack."  *Id.* (additional pages to Complaint labeled "'G Request for Relief'" at page 1).

      **3.  Delay During March 2005 Heart Attack.**  In one of his motions to amend, Plaintiff seeks to add Officer Burbanks as a named defendant based upon an allegation first made in the Complaint.  *Doc. 26.*  That is, when Pryce was experiencing the March 2005 heart attack, Officer Burbanks allegedly obstructed Plaintiff's access to medical care by saying "its (sic) only Pryce, let him walk to the hospital."  *Doc. 1* at 12.  Pryce maintains that he was "forced to walk approximately 110 yards to the medical department" and while there, a medical staff member

named "Mike" was

> arguing with . . . Burbank . . . pleading with him to call an
> ambulance [but that Burbank] continued to argue with
> "Mike" concerning technicalities [and it took] 30 minutes
> [to be] placed on a stretcher and carried by ambulance to
> the local hospital [from where he was then airlifted] to
> the Heart Hospital of New Mexico for surgery; which
> consisted of my arteries being unclogged and placing a
> "stent" in my right artery.

*Doc. 1* (additional pages to Complaint labeled "'D Cause of Action'" at page 2).

**4.   Improper Medications After March 2005 Hospitalization.**  Plaintiff

contends Dr. Lacy only gave him three of the six different medications prescribed

by the hospital, and though he corrected this later, it was not until August 2005

when a Dr. June prescribed "Phenylgesic [an] important medication." *Id.* at 2-4.

**5.   Failure To Provide A Second Opinion After The March**

**Hospitalization.**  Pryce asserts that Dr. Lacy would not allow him to get a second

opinion about his condition.  He further alleges that in June 2005 "after [Plaintiff's]

constant complaining about the different irregular symptoms . . . stated . . . 'The

only way your black ass is going to get a second opinion is by having another heart

attack.'" *Id.* at 3.

**6.   Failure To Provide A "Heart Healthy" Diet Prescribed After The**

**March Hospitalization.**  Plaintiff asserts that Defendants Cooper, Russell, Lacy and

Klinker refused to provide him with the diet recommended by "the doctor at the Heart Hospital of New Mexico." *Id.* at 4.

### 7.  Insubordination And Disorderly Charges After Filing Grievances.

Plaintiff alleges that in April 2005, Defendant Carpenter "threatened" disciplinary action for calling Dr. Lacy incompetent, and then in July 2005 "retaliated" by issuing an incident report charging him with insubordination after he called Dr. Lacy a liar in another grievance. *Doc. 1* at 3.  He also asserts that Defendant Lucero "retaliated" in July 2005 by issuing an incident report charging him with disorderly conduct after Pryce filed a grievance against Officer Nez. *Id.* (additional pages to Complaint labeled "'D Cause of Action'" at page 4).

### 8.  Insolence Charge After Speaking Out Concerning Dental Treatment.

In another of his motions to amend, Plaintiff seeks to add Nurse Roberts and a claim against her that was not mentioned in the Complaint.  According to Plaintiff, she issued an incident report for insolence after Plaintiff said that if he were "Mexican," she would not deny him access to the dentist. *See Doc. 27.*

### 9.  Delay During April 2006 Heart Attack.  In his last motion to amend,

Plaintiff seeks to add "Commander Quintana," who allegedly refused to call an ambulance during Plaintiff's second heart attack on orders from Warden Cooper. *See Doc. 80* at 2-3.  Plaintiff asserts that he was taken to the hospital on a prison

bus, arriving two hours after he had first notified prison officials of his condition and symptoms.  *Id.* at 3.

**10.   Warden's Comment And Order For "Padded" Cell After Second Heart Attack.**  In his last motion to amend, Plaintiff request the Court to "take notice of the additional facts."  *Id.* at 4.  He asserts that Warden Cooper visited him in the hospital and asked the guard "'that nigger ain't dead yet[?]'"  *Id.* at 3. Later, Warden Cooper ordered Pryce to be put in a padded cell upon his return from the hospital, where he had "no contact to the general population . . . required 5 blankets to remain warm [and] was not checked by the medical staff the entire night [as he] lay in bed bleeding from [his] nose."  *Id.* at 3.

### D.  *Plaintiff Should Not Be Permitted To Voluntarily Dismiss Claims 9 &10*

In their response to Plaintiff's latest motion to amend, Defendants argue that the Court should not permit amendment for two reasons:  (1) futility, because Pryce fails to state a claim for delay of medical care as a matter of law and as demonstrated by the present *Martinez* Report contents; and (2) prejudice, in that Plaintiff knew of the claim but failed to raise it earlier, and the proceedings are already protracted and could require an additional *Martinez* Report if the claim is permitted to go forward.  *See Doc. 83.*  In light of Defendants' arguments and jailhouse counsel's

advice, Plaintiff now wants to withdraw his motion to amend recognizing that "Defendant's attorneys were correct in their objection" because of "deficiencies contained in the Amended Complaint request, plus the futility of such a proceeding, at this particular stage of these proceedings." *Doc. 91* at 3.

Plaintiff's acknowledgment of "deficiencies" and "futility" could be read as conceding he fails to state a claim. On the other hand, his reference to "this particular stage" might also be a concession that the belated request could be disruptive and result in an unwarranted further protraction of these proceedings. Given that another of Plaintiff's recent motions have sought copies of filings seems to indicate that he anticipates further litigation, I am inclined to believe the latter. *See Docs. 86, 87.*

If Pryce's concession is an acknowledgment that he fails to state a claim, my recommendation below that the claim be dismissed on that basis does not alter his legal position. On the other hand, if his concession is based on a desire to raise the claim elsewhere, then my recommendation below will avoid piecemeal litigation after already protracted litigation by a contentious inmate. Therefore, I recommend that his motion to withdraw his motion to amend, *Doc. 91*, be denied.

# V.  Failure To Exhaust

Using the numbers that I assigned to the claims above, Defendants move to dismiss claims 1, 3, 4, 7, and 8 for failure to properly exhaust them.  *See, e.g., Doc. 77* at 10; *Doc. 84* at 10-12.  In a separate document, they assert in the alternative that Plaintiff should not be permitted to amend to add claims 9 and 10 because those claims are unexhausted.  *See Doc. 83* at 10.

It is true that the Supreme Court recently reaffirmed the proposition that "exhaustion is mandatory . . . . and that unexhausted claims cannot be brought in court." *Jones v. Bock,* ___ U.S. ___, 127 S. Ct. 910, 918-19 (2007) (citing *Porter v. Nussell,* 534 U.S. 512, 524 (2002)).  The exhaustion requirement is designed to be a disincentive for prisoners who would rather bypass available internal procedures and proceed directly to a lawsuit in federal court.  The hope is that some prisoner litigation may be avoided, and that the suits which are brought have better documentation for the court to consider.  *See, e.g. id.* at 914-15; *Woodford v. Ngo,* ___ U.S. ___, 126 S. Ct. 2374, 2387-89 (2006).

Because he is a federal prisoner, Pryce had two grievance procedures available to him – those at CCCC and those through the Bureau of Prisons.  *Doc. 56* at 2, nn. 2-3.  Pryce could hardly be characterized as the sort of prisoner who is

loathe to bring his grievances through available internal prison procedures.  Despite

the Court's admonition that he not do so, at every turn in this litigation Plaintiff has

blanketed this Court with hundreds and hundreds of pages of disorganized and

duplicative documents that show his internal complaints of practically every aspect

of his stay at CCCC.  It is obvious that he did so at CCCC as well.  *See, e.g., Docs.*

*33, 34, 63.*

The result is mounds of paper that takes the Court hours to cull and organize

before even starting to analyze the merits.  I have no doubt that Defendants faced

the same difficult task.  For example, their records did not include some of the

documents that Plaintiff submitted to the Court and so they were mistaken as to

whether one of the claims were actually exhausted.  *See Doc. 77* at 3, n.1; *see also*

*Doc. 84* at 2, n.1.  But the burden is no longer on Plaintiff to establish that he

exhausted his prison remedies.  Exhaustion is now an affirmative defense and

Defendants bear the burden of proving a prisoner's failure to exhaust administrative

remedies.  *See Jones,* 127 S. Ct. at 921.

Here, the internal prison documents submitted by Defendants and Plaintiff

present opposing factual issues[6] and complicated legal issues about exhaustion

---

[6] Defendants label the motion as one "to dismiss" but they attach affidavits and documents to the motion and reference the documents submitted with the *Martinez* Report.  *See, e.g., Docs. 43, 77, 84.*  Yet they recognize that their request is in a summary judgment posture.  *See*

"availability."[7]  For example, CCCC's grievance procedures do not permit

grievances concerning a disciplinary hearing or the appeal of a disciplinary decision.

*See Doc. 43,* Exh. A at 3 (¶ C.5).  Yet, the subjects of claims 7 and 8 are  threatened

or actual disciplinary infractions for the language Plaintiff used during the course of

his grievances.

Also, although Defendants now take the position that Pryce no longer has

any remedies available because the time to file them has expired, that was not their

position before he was transferred to a prison in California.[8]  In a memorandum

from Defendant Carpenter to Plaintiff in July 2006, Carpenter invited him to

submit what would have been a belated claim concerning claim 9 and investigated

---

*Doc. 84* at 3.  Indeed, a *Martinez* Report itself is treated like an affidavit and cannot be used to resolve issues of material fact.  *E.g., Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir. 1991).

[7]  *E.g., Whittington v. Ortiz,* 472 F.3d 804, 807-08 (10th Cir. 2007)("when prison officials fail to timely respond to a grievance, the prisoner has exhausted 'available' administrative remedies"); *see also Mitchell v. Estrada,* 2007 WL 475822 at *3, n.3 (10th Cir. 2/15/07) ("Under § 1997e(a), the question is straightforward:  whether the prisoner has exhausted 'such administrative remedies as are available.'  *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir. 1998) (noting that PLRA does not define 'available')"); *cert. denied,* 526 U.S. 1133 (1999); *Gonyea v. Mink,* 2006 WL 3291702 at *1 (10th Cir. 2006) ("Although administrative remedies may be deemed unavailable due to obstruction of the grievance process . . . *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from 'utiliz [ing]' is not an 'available' remedy under § 1997e(a).").

[8]  *Compare Doc. 77,* Exh. 1, ¶ 5 (Carpenter Affidavit stating "if Plaintiff were to file a grievance at this point . . . the grievance would not be accepted, because according to the facility's grievance policy an inmate must file a grievance within seven  . . . days of the alleged incident"), *with Doc. 43,* Exh. B (Carpenter Affidavit stating that Plaintiff failed to file grievances covering certain claims).

the complaint anyway.[9]  In another memorandum in July 2006, Carpenter noted one matter was pending, and invited Pryce to submit what he thought was already pending, as well as any "other issues that have not yet been addressed." *Id.* (attachment dated 7/19/06).

The Court is not critical of Carpenter's offer of assistance – to the contrary. If, however, failure of prison officials to timely respond to a grievance renders administrative procedures unavailable and exhausted, then it would appear to follow that a waiver of time-limit rules can render otherwise unavailable procedures available and unexhausted.  *E.g., Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002) (and cases therein); *see also Whittington,* 472 F.3d at 808 ("because the CDOC did not timely respond to Mr. Whittington's . . . grievance, Mr. Whittington effectively exhausted his administrative remedies.").  Even though Plaintiff was transferred to a federal facility in California, under Tenth Circuit law the transfer does not make CCCC's procedures unavailable.[10]

---

[9]  *See Doc. 82* (attachment dated 7/12/06 that states Carpenter was not aware of the complaint about Quintana and medical assistance but that "[i]f you wish to pursue this complaint, you are reminded of the procedures . . .  Pending your submission of this complaint, I will meet with . . . Quintana and inquire as to the facts").

[10]  *E.g., Johnson v. Wackenhut Corrections Corp.,* 130 Fed. Appx. 947, 950 (10th Cir. 2005) ("There is also no evidence that plaintiff ever attempted to file an untimely grievance form, either upon his release from the medical unit or protective custody or upon his transfer to a different prison in July 2001."); *Gonyea,* 2006 WL 3291702 at *1 ("Mr. Gonyea could have filed a grievance with the JCDF from the Arapahoe County Jail to which he was transferred,

Finally, the prison investigated claims 1, 3, 4, and 9, and issued written

decisions about the findings, thereby satisfying one of the reasons behind the

exhaustion requirement.  Some of the written findings tell Plaintiff that further

complaints will not be entertained.[11]

---

complaining in that grievance that he had been prevented by the JCDF from filing earlier.  His
own records reflect he was actively filing request forms at the Arapahoe County Jail by December
9, 2003, at the latest, a mere two weeks after his transfer from the JCDF on November 26,
2003."); *Jones v. Barry,* 2005 WL 319012 at * 3 (10th Cir. 2005) ("Mr. Jones contends his transfer
from the Torrance prison to the prison in Virginia excuses him from having to fully exhaust these
claims.  We cannot agree.").

Plaintiff is willing to pursue the remedies from California, if necessary.  *See Doc. 82* at 4
("if this Court deems that further exhaustion is needed, the Petitioner requests that the Court
order CCA New Mexico to sent hm the appropriate forms so that he can exhaust his
administrative remedies.").

[11] *See, e.g., Doc. 82* (attachment, 2/28/05 Maki informal grievance response); *Doc. 63*
(7/22/05 Maki informal grievance response stating that with "regards to the incompetency of Dr.
Lacy, and the medical treatment you have received I will not address.  This issue was already
addressed on two separate occasions.  One on April 8, 2005, and on April 13, 2005 by Assistant
Warden Russell.  You had also filed a[n] informal resolution on April 11, 2005 regarding Dr.
Lacy, in which it was answered an returned to you on April 20, 2005, with no action taken.")
*Doc. 32* (attachment; same Maki response); *Doc. 46, Exh. O* (sealed internal investigation dated
12/16/05 regarding, among other things, second heart attack); *id.,* Exh. U (4/26/05 Carpenter
response to grievance "05-504-025" stating "Finally, you indicate in the informal stage of your
grievance that you feel that because of Dr. Lacy's incompetence and deliberate indifference, you
have suffered.  I believe that the knowledge and professionalism of the member of the medical
department is the reason that you are alive and on the road to recovery.  Had they not responded
in the manner in which they did, you may have suffered more sever consequences related to your
overall health and heart condition.  During a recent meeting with the Health Service
Administrator and the Assistant Warden, you were directed to discontinue referring to members
of the medical department as incompetent and I am reinforcing this directive at this time.
Because this is your personal opinion, and because it can easily be proven otherwise through
numerous external audits and the constant supervision and oversight by senior staff, this can be
considered a lie.  Future references of this nature toward any member of the staff without
substantial proof will be handled through the disciplinary process.  In closing, I cannot
substantiate your claim [re: diet or discrimination].  I can however, challenge your indication

Finally, the exhaustion requirement is not jurisdictional, and the Court has the authority "to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies." *Woodford,* 126 S. Ct. at 2392. In the wake of *Jones,* the Tenth Circuit has endorsed this approach.[12]  In light of the comprehensive *Martinez* Report now before the Court, I recommend taking that easier route rather than opting for additional briefing and a possible hearing to resolve the exhaustion issues.  Thus, I recommend denial without prejudice of the renewed motion to dismiss *(Doc. 77)* and rejection of arguments to deny permission to amend *(Doc. 83)* insofar as they rely on exhaustion grounds.

## VI.  *Martinez* Report Conclusively Establishes That Dismissal On The Merits Is Warranted

---

that members of the medical department are incompetent or that they suffer from deliberate indifference to your medical needs.  On the contrary, our success with multiple CFM audits, the interactions with local professionals in the medical field and the results of the recent ACA and JCAHO certification give testimony to the fact that our medical department is staffed with highly trained and caring individuals.  Upon review of your complaint, I believe the decisions made by members of the medical department were in your best interest."); *Doc. 8* (attachment, same Carpenter response).

[12]  *See Stephens v. Guilfoyle,* 2007 WL 458017 at * 1 (10th Cir.  2/13/07) (stating that district court's failure to address exhaustion and dismissing on statute of limitations grounds "was entirely proper" under *Woodford* and § 1997e(c)(2)); *Fisher v. Mullin,* 2007 WL 127655 at * 1, n.1 (10th Cir. 1/19/07) ("The parties dispute whether Mr. Fisher exhausted his prison grievance remedies on all of this claims . . .  We do not resolve this issue because we affirm the district court on the merits.  *See Woodford.*").

The cover memorandum to Defendants' *Martinez* Report is their motion for summary judgment. The same numbered document also contains Bates-stamped and other exhibits. *See Doc. 46 Martinez Report* at 1-28 & Exhs. A-V; *see also Doc. 47* (attaching Exhibit K-1 as supplement to *Martinez* Report). I must forewarn the reviewing court that the organization of the medical records in Exhibit A to the *Martinez* Report is less than clear. Similar medical records are scattered throughout the 605-page Exhibit A, the pages are not in strict chronological order, and certain pertinent documents are contained in yet other exhibits. Having scrutinized the entire *Martinez* Report carefully, my citations to parts of it below are intended to illustrate the what the entire document reflects rather than an exhaustive citation to every portion of the record.

I cannot agree with Defendants' characterization of Plaintiff's factual assertions as conclusory, nor do I fully subscribe to the chronology of events that is implied in some of the affidavits. Nevertheless, the facts referenced by Defendants throughout their motion for summary judgment and reply are generally accurate. *See Martinez Report* at 2-27; *Doc. 73.* Moreover, Defendants persuade me that none of Plaintiffs claims, even those sought to be added by the motion to amend, have merit as a matter of law. *See Docs. 37, 83.* Therefore, I incorporate the arguments contained within those documents by reference. To that legal analysis, I add the

19

following observations and findings.

### A. *Plaintiff Entered CCCC Agitated & Complaining Of Racial Discrimination*

As noted earlier, Plaintiff has not adjusted well to incarceration, at least in the Southwest.  Plaintiff was agitated prior to his arrival at CCCC in late December 2004.  For example, two to three weeks before his transfer to that facility, Plaintiff was seen by a mental health counselor at the Giles W. Dalby Correctional Facility in Texas, because he was "constantly c/o [complaining of] of prejudice and unfair TX [treatment]."  *Martinez Report,* Exh. A (CCCA00383).  During those mental health counseling sessions he complained of stress, not sleeping well, and constant headaches.  He attributed these symptoms to "prejudice & mistreatment by Hispanic IM's [inmates] and officers."  *Id.* at CCCA00384.  The counselor assessed Pryce with having an adjustment disorder and anxious and depressed mood.  *Id.*

Immediately upon his arrival at CCCC, Plaintiff was uncooperative and began filing grievances.  As but one example, initially he refused to allow his blood to be drawn and tested, but then relented a few days later.  See *Martinez Report,* Exh. A (CCA00472-73).  In February 2004, he sought out mental health services at CCCC, again focusing on complaints of "racial discrimination" and "staff favors Hispanics."  He cited "mental stress, complaining of headaches, insomnia," and appearing "very angry, upset, insistent."  *Id.* at CCCA00380.

20

The following week, Pryce voiced the same complaints that his "nerves are 'shot,' can't sleep, very stressed," yet his demeanor was calm and soft-spoken.  No follow-up appointment was scheduled because "he will request if desired."  *Id.* at CCCA00379.  Later Plaintiff would admit during his regular counseling sessions at CCCC that he was "afraid and confused by this institution," *id.* at CCCA00375, and wanted to be transferred to a prison where there were "larger groups of black people," *id.* at CCCA00363.

### B.  Comments Are Not Actionable

I will assume for the purposes of argument that the comments Plaintiff complains of were indeed made.  The Court does not approve of such comments and finds them utterly reprehensible and unprofessional.  Nevertheless, it is well-settled that the cited comments are not actionable.  For example,

> Mr. Moore's sole complaint against Mr. Morris is that Mr. Morris verbally abused him with a racial epithet.  If the alleged conduct occurred, it is inexcusable and offensive; it does not, however, amount to a constitutional violation, as the Magistrate Judge noted.
> . . . Perhaps situations exist in which verbal abuse might amount to cruel and unusual punishment, but this matter does not present such a situation.  S*ee McBride v. Deer,* 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) ( "[A]cts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment."); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir. 1979) (holding that a sheriff's

threats to hang a prisoner were insufficient to state
constitutional deprivation under § 1983 ). Similarly, Mr.
Moore's allegation that the verbal abuse caused him
embarrassment and emotional injury in the form of pain,
suffering, mental stress, and depression does not
constitute an actionable claim.  Mental or emotional
stress, without physical injury, is insufficient to state a
§ 1983  claim based on conditions of confinement.  *See* 42
U.S.C. § 1997e(e) ("No Federal civil action may be
brought by a prisoner confined in a jail, prison, or other
correctional facility, for mental or emotional injury
suffered while in custody without a prior showing of
physical injury."); *Thompson v. Gibson,* 289 F.3d 1218,
1222 (10th Cir. 2002) ("As to [plaintiff's] claim for
emotional distress, no § 1983  action can be brought
unless the plaintiff has suffered physical injury in addition
to mental and emotional harms.") (citing 42 U.S.C.
§ 1997e(e))[, *cert. denied,* 537 U.S. 578 (2002)].

*Moore v. Morris,* 116 Fed. Appx. 203, 205 (10th Cir. 2004), *cert. denied,* 544 U.S. 925

(2005); *see also Curiale v. Hawkins,* 139 Fed. Appx. 21, 23 (10th Cir. 2005) ("We

find no error in [the] recommendation to dismiss his claims that Defendants'

statements violated his civil rights [under *Collins]"*); *Buford v. Leck,* 1993 WL

125412 at * 1 (10th Cir. 1993) ("this court has held that words alone, no matter

how reprehensible, are not sufficient to state a constitutional deprivation," citing

*Collins*).  Other circuits and districts are in accord.  *See, e.g., Shabazz v. Cole,* 69 F.

Supp. 2d 177, 199 (D. Mass. 1999) (and cases cited therein).

Therefore, I recommend that Claim 1, and part of Claims 5 and 10 be

dismissed.

## C.  Alleged "Retaliation" For Insubordination

Freedom on expression is not without limits in the prison setting, however.

Regulations aimed at security, order and rehabilitation that infringe on those rights

are constitutionally permissible.  Here, CCCC regulations prohibit "insolence" and

"disruptive" behavior by inmates, as well as prohibiting prison officials from

imposing discipline that is "capricious or retaliatory."  *See Martinez Report,* Exh. R

(§§ 541.10(1)(b)(2)-(4) and Table 3, Codes 307, 309, and 312).  I find those

regulations reasonable.[13]

---

[13]  There are no Tenth Circuit decisions addressing insolence or other similar regulations, and other circuits are split.  I agree with the position taken by the Seventh Circuit.  *Compare Clayton-El v. Caraway,* 1992 WL 266023 at ** 3-4 (7th Cir. 1992) ("Under IDOC regulations, a prisoner may be disciplined for 'insolence' . . .  This regulation clearly limits certain speech that would be protected outside the prison context.  But [under] *Turner v. Safley,* 482 U.S. 78, 89 (1987) . . . [s]everal factors determine a regulation's reasonableness . . .  In light of these factors, the IDOC regulation against insolence is clearly valid.  First, there is certainly a rational connection between a rule against insolence and the fundamental penological interest of maintaining order.  Second, Clayton-El could easily express his refusal to cooperate without showing disrespect.  And third, allowing inmates to behave insolently towards guards would clearly undermine the guards' ability to do their jobs.  Thus, even if Clayton-El were placed in segregation for "smart-mouthing" and "cursing" at Caraway, we find no violation of Clayton-El's right to free speech.  The district court properly granted summary judgment for the defendants on Clayton-El's claim that he was placed in segregation in violation of his constitutional rights to due process and freedom of speech."), *with Hancock v. Thalacker,* 933 F. Supp. 1449, 1489 (N.D. Iowa 1996) ("the court finds that the prison's punishment of 'false' or 'defamatory' statements made in grievances is an 'exaggerated response' to the problem.").

It is true that in *Procunier v. Martinez,* 416 U.S. 396, 413 (1974), the Supreme Court "stated, '[p]rison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements.'"  *Gandy v. Ortiz,* 122 Fed.  Appx. 421,

Caselaw also prohibits prison officials from retaliating or harassing an inmate who files grievances or lawsuits. *E.g., Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir. 1990).   On a motion for summary judgment, the Court must ask whether a fair-minded juror could reasonably infer that prison officials disciplined him in part based on the improper motive.  However, to avoid dismissal, Plaintiff bears the burden of showing that "but for" the improper motive, the discipline would not have been imposed. *Id.* at 949; *see also e.g., Purkey v. Green,* 28 Fed. Appx. 736, 745 (10th Cir. 2001) ("because Mr. Purkey cannot show that filing a grievance was the "but for" cause of his segregation, *see Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir. 1998), we affirm dismissal of this claim.").

Plaintiff fails to meet this burden.  Pryce's grievances and filings here demonstrate his propensity to use insubordinate language, to lash out verbally about the different treatment accorded Hispanics, and to repeatedly invoke the grievance process with the same complaints.  Although in his response to the *Martinez* Report Plaintiff has changed assertions where he deems it advantageous, it is undisputed that the remarks for which he was either charged or disciplined were indeed uttered

---

422-23 (10th Cir. 2005).  However, in *Thornburgh v. Abbott,* the Supreme Court limited the *Martinez* holding to outgoing mail.  490 U.S. 401, 413 (1989)("we acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence.").

by Plaintiff.[14]

Under substantially similar circumstances, the Tenth Circuit has upheld

charges or discipline by prison officials as justifiable in the correctional context.

> Hinshaw filed a disciplinary action against Ladd for being
> loud and argumentative at the disciplinary hearing.  In
> response, Ladd filed at least two grievances claiming his
> removal as inmate counsel and the filing of the
> disciplinary action against him were in retaliation for
> grievances and lawsuits filed against Hinshaw.
> Thereafter, Ladd was found guilty of insubordination and
> sentenced to fourteen days of disciplinary segregation and
> thirty days restriction.  On the day Ladd was found guilty,

---

[14]  *See, e.g., Doc. 1* at 3 (Plaintiff recounting that he called Dr. Lacy "incompetent" and a
"lier"); *id.* (attached 5/2/05 letter to Cooper stating "[h]ow dare Mr. Carpenter . . . threten me (a
federal prisoner) with disciplinary actions.  For stating in my grievance that medical staff . . . were
incompetent in handling my medical needs."); *Doc. 27* at 1 (Plaintiff recounting that he "told
Defendant Roberts 'if I was Mexican, would you be denying me medical treatment and
discriminating against me.'"); *see also Doc. 34* (attached table; 7/25/05 CCA/CCCC Grievance
Informal Resolution Form re: Maki is "a lyer you are not monitoring my condition. I have to beg
you for proper medic care . . ."); *Martinez Report,* Exh. T (submission at regional level calling Dr.
Lacy "unprofessional, negligent").

Plaintiff was cleared of the "disruption" charge, not because he complained to Officer
Lucero in the recreation yard that Hispanic inmates are treated more favorably, but because the
inmate witnesses Plaintiff called at the hearing testified that there was too much noise in the yard
for them to overhear the conversation.  *Martinez Report,* Exh. T (Discipline Hearing Report dated
8/8/05 stating "Inmate Pryce advised that he . . . was just talking to Mr. Lucero about an issue he
felt concerned about"); *id.* (incident report dated 7/28/05 alleging that in discussing his
complaint, Pryce stated in a "loud and boisterous" voice that "if a Spanish inmate were to twist
his ankle six medical personnel would rush to assist him with a stretcher [and] when a Spanish
inmate was struck in the face with a ball two officers ran to help him.  However he had a heart
attack and was denied medical."); *Doc. 1* (additional pages to Complaint labeled "'D Cause of
Action'" at page 3) ("On July 28, 2005 . . . I was issued this incident report after a conversation I
had . . . concerning a grievance which I had submitted alleging discrimination against me by
officer Ms. Nez, who had refused to allow me to go to the medical department.  Though I was
refused by officer Ms. Nez to go to medical, she allowed other Spanish inmates to go").

he declared he was on a hunger strike.  The next day,
prison officials ordered him to strip cell confinement. By
Ladd's own account he was released from strip cell
confinement approximately thirty hours later. . . .

In [granting summary judgment], the district court found
that, to the extent Ladd claims the disciplinary action
against him denied him due process or constituted
conspiratorial retaliation and/or discrimination, the
claims lacked merit.  The court found that:  it was
undisputed that Ladd was disruptive in the disciplinary
proceeding in which he appeared as substitute counsel;
there was sufficient evidence to support the disciplinary
finding that he was guilty of insubordination; Ladd's
beliefs that his conduct did not violate institutional rules
and was justified by his duty to advocate were not legally
founded; and Ladd's claims of retaliation and/or
discrimination were conclusory and far-reaching.  The
district court rejected Ladd's claims that his placement in
strip cell confinement was unwarranted and racially
motivated.  The court found that Ladd was placed in strip
cell confinement to prevent further disruption which was
not unreasonable and did not constitute an unexpected
hardship as to give rise to a protected liberty interest in
not being so confined.  Finally, the district court found
that Ladd failed to show that he was denied basic human
needs or that the prison official acted with deliberate
indifference by placing him in strip cell confinement so as
to amount to a violation of the Eighth Amendment. . . .
[W]e AFFIRM substantially for the reasons stated in the
district court's Memorandum and Order.

*Ladd v. Stotts,* 1997 WL 153767 at ** 1-2 (10th Cir. 1997).[15]

---

[15]  *See also e.g., Purkey,* 28 Fed. Appx. at 745 (because Mr. Purkey cannot show that filing
a grievance was the "but for" cause of his segregation . . . we affirm dismissal of this claim.
Certainly it was necessary to remove Mr. Purkey from the dangerous condition in which other

Other courts are in accord, specifically stating that "district courts must 'carefully scrutinize' claims of retaliation in order to ensure that prisoners do not 'inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves.'" *Thunderhorse v. Pierce,* 418 F. Supp. 2d 875, 898 (E.D. Tex. 2006) (quoting *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied,* 516 U.S. 1084 (1996).  And, "'while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform.'" *Id.* (quoting *Orebaugh v. Caspari,* 910 F.2d 526, 528 (8th Cir. 1990), and holding that an inmate's refusal to abide by a prison grooming code cannot support a claim that "punishments imposed for this failure to groom were retaliatory in nature").

Therefore, I recommend that Claims 7 and 8 be dismissed.

---

inmates were threatening to beat him, and it was not unreasonable per se to place him in segregation instead of the four or five inmates who threatened him."); *Marsh v. Newton,* 1998 WL 39235 at * 3 (10th Cir. 1998) ("plaintiff has not established a link between her protected First Amendment activity and the disciplinary proceedings she asserts were retaliatory. . . . therefore, the district court did not err in granting defendant's motion for summary judgment."); *Marsh v. Corrections Corp. of America,* 1998 WL 31435 at * 3 (10th Cir. 1998) ("Plaintiff contends that her evidence of the chronology of events is sufficient to create a genuinely disputed issue of fact as to defendants' motive.  We disagree"); *Wright v. McCotter,* 1999 WL 76904 at * 2 (10th Cir. 1999) ("While Plaintiff claims that Defendants imposed segregation in May 1997 in retaliation for his filing a grievance in March 1997, we think that Plaintiff's earlier legal filings in 1991 and 1993 negate any inference of retaliation that may be drawn from temporal proximity.");

### D.  Lacy's Alleged Misdiagnosis Is Not Actionable

Nothing in Plaintiff's prior medical records from September 2003 to his December admission to CCCC refers to objective findings of, complaints of, or a history of high cholesterol or chest pain or other cardiovascular problems.  *See Martinez Report,* Exh. A (CCA00105-141, 252-278).  Rather, Pryce was then being treated for lower back pain and allergies, was counseled to walk and stop smoking, and was permitted to be off work at the prior institution.  *See, e.g., id.* at CCA00109-115.

When he arrived at CCCC, Plaintiff continued complaining of lower back pain.  Following a review of prior x-rays, Pryce was prescribed various medications. He wanted "Lortab," however, a medicine CCCC would not prescribe because it is a narcotic, and the Bureau of Prisons "does not permit chronic narcotic use."  *Id.,* Exh. C at ¶ 6 (hereinafter Lacy Affidavit); *see also id.,* Exh. A (CCA00101-04). Plaintiff's prior blood tests were also reviewed and found to be within normal limits, though the exact values were not reflected in the CCCC medical document, nor are the tests of record.  *Id.,* Exh. A (CCA00101-04).

I am going to presume, without deciding, that a heart attack is "sufficiently serious" to implicate the Eighth Amendment.  Thus, the objective prong of the deliberate indifference test is satisfied.  *See, e.g., Mata v. Saiz,* 427 F.3d 745, 752-755

28

(10th Cir. 2005).  However, Plaintiff must also establish the subjective prong.  *Id.* at

755.  That is, Pryce must show the defendants "knew he faced a substantial risk of

harm and disregarded that risk, by failing to take reasonable measures to abate it."

*E.g., Callahan v. Poppel,* 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotations

and citation omitted).

     A showing of negligence or malpractice simply does not meet that burden.

*Id.* at 1160 (citing, among others, *Estelle v. Gamble,* 429 U.S. 97, 105-107 (1976)).

Likewise, claims of a "right to a particular course of treatment" are not actionable.

The Tenth and its "sister circuits have rejected such an expansive view of the rights

protected by the Eighth Amendment. . .  At worst [by failing to pursue a particular

course of treatment], the defendants may have committed malpractice, but the

Eighth Amendment does not redress such a claim."  *Callahan,* 471 F.3d at 1160.

Yet these are the very allegations Plaintiff has made throughout these and the

prison proceedings.  *See, e.g., supra,* page 8 & n. 11.

     The record indicates that Dr. Lacy and the lab that issued blood results had a

difference of opinion about the proper course of treatment.  A report of Plaintiff's

blood test results from January 2005 showed several out-of-range values in

Plaintiff's lipids — some of which were high, as Pryce alleges he was told.  The report

also showed Plaintiff was at high risk for a heart attack based on his C-Reactive

Protein results and recommended that, with such results, the patient should be retested and examined for inflamation or infection.[16]

Dr. Lacy did not start any medications as a result of the results or order more tests. He did not do so because "Pryce's LDL [cholesterol] was 138, which is just slightly higher than 130 (the target amount)," which is indeed what the lab results show. *See Martinez Report,* Exh. C at ¶ 8 (hereinafter "Lacy Aff."); *see also id.,* Exh. A (CCA00152). In Dr. Lacy's view, the

> most predictive test for potential future heart trouble would be the LDL Cholesterol . . . [and] his cholesterol levels were not high enough to require medication without further disease processes present (such as diabetes and hypertension). . . . There was nothing on the initial lab test that would raise immediate concern of heart trouble. Additionally, Pryce's blood pressure and sugar levels were normal. These are important risk factors for future heart troubles. . . . Another factor for future heart troubles is anger management issues. . . . There were lifestyle changes Pryce could make, such as diet, exercise, cessation of smoking, weight loss, that would both help his back pain and decrease his risk of heart disease.

*Lacy Aff.,* ¶¶ 8-12. Furthermore, Pryce's "blood pressure remained normal," and there "were no indications of cardiovascular disease prior to his heart attack." *Id.,*

---

[16] Due to prison policies, inmate lab results are not shared with them, and the lab results document is sealed. *See, e.g., Doc. 45.* Therefore, I confine my remarks to general comments about the content of the report.

¶¶ 13-15.

Plaintiff believes that Dr. Lacy's alleged misdiagnosis "caused" his March 2005 heart attack.  However, the record reflects that the alleged second cardiac event in April 2006 occurred despite the following precautionary measures: Plaintiff had a stent in place; various medications for cholesterol and the heart had brought some of his blood level results in line; Pryce was exercising and trying to quit smoking; and Pryce was trying to eat right and was managing his anger with counseling.  Indeed, the lab results indicate that his C-reactive protein value was **not** high one month before he experienced chest pains in April 2006.  *See id.* at CCA00145.  These observations underscore that it may be impossible to isolate a single cause of a cardiac event.

The material facts are not in dispute.  At best, an initial misdiagnosis of heart disease, or difference of opinion in the course of treatment to follow given certain blood work results, are malpractice and not actionable as a § 1983 claim or under *Bivens.*  Accordingly, Claim 2 should be dismissed.

### E.  Other "Course Of Treatment" Claims Are Not Actionable

Plaintiff makes the following "course of treatment" claims: he was not given the correct medications after his heart attack; he was not permitted a second opinion about his condition shortly after his first heart attack; he was not provided

31

the heart healthy diet he was prescribed; and he was placed in a padded cell after returning from the hospital after his alleged second heart attack.

When Plaintiff was discharged from the hospital after his first heart attack, he was prescribed four medicines: aspirin, the beta blocker Metropolol, Plavix, and Lipitor. *See id.* at CCA00403, 423, 425. Dr. Lacy substituted Mevacor for Lipitor,[17] added Nitroglycerin pills for him to take as needed, and ordered the other medications. Plaintiff was allowed to keep the entire bottle of Nitroglycerine and instructed to return to the clinic if he needed to take one, but he was not permitted to keep a full bottle of Plavix as he demanded. Pryce was given 30 "Percogesic"[18] tablets for his back pain on March 9, 2005 and was reissued 31 tablets in mid-April 2005. *See id.* at CCA00081-84, 201-05, 232-33, 400.

The only instructions for a "heart healthy" diet on discharge was for Plaintiff to eat "low fat/low cholesterol" foods. The cardiologist did not prescribe a specific diet. *Id.* at CCA00423, CCA00425. Plaintiff chose to follow a "religious diet,"

---

[17] Mevacor is the brand name for the drug "lovastatin" which is among the group of statin drugs used to lower cholesterol. *See www.medterms.com/script/main/art.asp? articlekey= 13807.*

[18] "Percogesic" along with other brand names such as Apagesic, Dolorex, Duogesic, Flextra SD, and Genasec, is a combination of acetaminophen and phenyltoloxamine. *See www.drugs.com/percogesic.html.* It is used to treat minor pain such as back aches. *See www.medicinenet.com/acetaminophenphenyltoloxamine-oral/article.htm.*

which was determined by the dietician and Dr. Lacy as a "heart healthy menu" and "probably the best diet [he] could follow." *Id.,* Exh. E at 2. Plaintiff simply did not like that diet, and wanted something else. *See id., see also id.* at Exh. F at 1; *id.,* Exh. U; *Doc. 63,* Exh. E at 1 (within one month after the heart attack, prison officials cautioned him that he continued to purchase "food items high in sugar, fat, cholesterol and sodium" from the commissary.)

Plaintiff was not returned to prison after his first heart attack without any other regular follow up care. Pryce simply was not allowed to see another doctor whenever he demanded one. He was seen routinely at the prison either by medical, dental, or mental health staff to monitor for hypertension, chest pain, dental problems, and to assist Plaintiff in his compliance with a diet, exercise, losing weight, stop smoking, and anger management program. *See id.,* Exh A (CCA00049-86, 169-171, 341-78, 389-91. His lab work was repeated periodically, and he was sent for an EKG in October 2005. *See id.* at CCA00147-48, 160.

Moreover, in February 2006, the prison sent Pryce to his cardiologist for follow-up and to assist with the Plavix treatment plan. *Id.* at CCA00502-03. He was sent to the cardiologist yet again in March. During one of the routine visits to the cardiologist, it was discovered Plaintiff had another infarction. This is discussed further below.

Finally, the "padded" cell where he was placed upon his return to the hospital was a ***medical*** cell so that he could be observed.  He was monitored every 15 minutes for approximately seventeen hours beginning at approximately 3:00 in the afternoon.  *Id.* at CCA00022; *see also id.* at CCCA00243.  He complained initially that he did not want not want to be there and refused his dinner, but later "voiced no complaints when asked if he was comfortable [and] responded calmly to questions; breathing even and unlabored, no distress noted at this time."  *Id.* at CCA000023.  Pryce slept all night and was returned to general population the next morning at 8:45.  *Id.* at CCA00022.

Thus, all of the above claims either represent misunderstandings on the part of Plaintiff, misrepresentations on the part of Plaintiff, and/or are situations where he disagreed with the course of treatment he received.  It is well-settled, however, that a prisoner "'who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.'"  *Perkins v. Kansas Dep't of Corrs.,* 165 F.3d 803, 811 (10th Cir. 1999) (internal citations omitted); *see also, e.g., Callahan,* 471 F.3d at 1160; *Self v. Crum,* 439 F.3d 1227, 1232 (10th Cir.), *cert. denied,* 127 S. Ct. 131 (2006); *Mata,* 427 F.3d at 761.

Therefore, I recommend that Claims 4 and 6, and the remainder of Claims 5 and 10 be dismissed.

### F.  Allegations of Delay Are Not Actionable

For the first heart attack, Pryce told his doctors that the "onset" was at

"2010" or 8:10 p.m on March 18, 2005.  *See Martinez Report,* Exh. A (CCCA00312,

319, 321, 323).  At 8:23 p.m., he entered the medical unit complaining of chest

pain and medical staff immediately called for an ambulance.  Less than twenty

minutes later, at 8:42, the emergency medical technicians arrived.  He was treated

with aspirin and nitroglycerin.  By 9:08 p.m. Pryce was in the ambulance on the way

to the hospital, where he arrived twenty minutes later.  The next morning, he was

airlifted to another hospital to undergo the stent procedure.  *See Exhs. I, J; see also*

*id,* Exh. A at CCA00312, 319, 323, 328, 401-02.

No doubt it felt like eons passed from the time Pryce first felt the chest pain

to the time he arrived at the hospital.  But unlike other cases where claims of delay

in the face of a heart attack have been held actionable, Plaintiff's complaints were

neither taken lightly nor dismissed altogether.  He was not simply returned to his

cell to suffer chest pains until he could persuade medical staff to see him again.

Instead, upon making correctional staff aware of his symptoms, Pryce was

taken from his cell to the medical unit, where he received constant and appropriate

care until he was loaded into the ambulance.  Given the logistics of transporting a

prisoner from his cell to an emergency room, I cannot find that thirteen minutes

35

from onset to entry in the medical unit, or one hour from onset to entry in the

ambulance is unreasonable or amounts to unconstitutional delay.  *See Self,* 439 F.3d

at 1232 (noting subjective prong of deliberate indifference could be met if "a patient

complains of chest pains and ***the prison official,*** knowing that

medical protocol requires referral or minimal diagnostic testing to confirm the

symptoms, ***sends the inmate back to his cell.***  *See, e.g., Mata,* 427 F.3d at 755–59;

*Sealock,* 218 F.3d at 1211–12.") (emphasis added); *see also Kikumura v. Osagie,* 461

F.3d 1269, 1294-96(10th Cir. 2006) (perfunctory examination by doctor and then

return to cell of prisoner experiencing light pain, nausea and inability to walk states

a constitutional claim; 3 ½  hour delay in correctional officers calling infirmary after

prisoner returned to his cell when they could see Plaintiff in pain and rapidly

deteriorating states a constitutional claim).

As to the second cardiac event in April 2006, Defendants have not

submitted any similar documentation of the medical and officers' time sheets.  *See*

*Docs. 80, 81.*  Nor do they mention how he was transported.  However, according to

the medical records submitted with the *Martinez* Report, this is what transpired.

Plaintiff was seen by his cardiologist on a non-emergency basis on March 20,

2006 after complaining of chest pain.  The cardiologist ordered a stress test, and

one was scheduled for April 6, 2006.  *See Martinez Report,* Exh. A (CCA00304-05,

310).  On April 3, 2006, Plaintiff refused to be seen by prison medical staff for a
cardiac check.  *Id.* at CCA00033.  Three days later, on the same day he was
scheduled for the stress test, Pryce was seen by medical staff for complaints of
shortness of breath.  He was "cont. to leave on transport," and presumably went to
the hospital for the stress test via non-emergency transport.  *Id.* at CCA00032.

 Although the April 6, 2006 stress test report revealed a "small to moderate
area of infarction with mild periinfarction ischemia defect, located in the baseal
inferior wall," the "stress test was clinically negative for ischemia," and the "stress
EKG not suggestive of ischemia."  *Id.* at CCA00309; *see also id.* at CCA00031, 304.
The report recommended that Plaintiff follow up with a "Dr. Batty," a cardiologist
who is listed as among those in the Albuquerque office of the Heart Institute.  *See
id.* at CCA00309 ("Recommendation:  Follow up with Dr. Batty"); *id.* at
CCA00305 (Dr. Chandler S. Bhatia referred for the stress test and masthead lists a
Dr. "John W. Batty"); *id.* at CCA00297 (subsequent Dr. "Batty" referral for
catheterization).

 As an April 13, 2006 entry notes, Plaintiff returned that day to the prison
after the "off site consult @ NM Heart Institute."  *Id.* at CCA00030.  The plan was
for him to undergo a cardiac catheterization on April 27, 2006, which he did.  *See
id.* at CCA00029-30, 297, 303.  He was returned to prison on April 28, 2006, after

the catheterization.  *See id.* at CCA000025, 27, 297-301.

Just days later, on April 30th, Plaintiff awoke with chest pains sometime between 4:30 or 5:00 a.m.  *See id.* at CCA00024, 296.  After then eating breakfast, Pryce first notified a correctional officer of his symptoms at 6:00 a.m.  *Doc. 80* at 2. Pryce was in the medical unit by 6:25 a.m. and given nitroglycerine and aspirin at 6:50 a.m.  *See id.* at CCA00024, 282.  The new prison physician, Dr. Kimball, was contacted, and he gave orders to send Plaintiff to the emergency room.  *See id.* Pryce was "out of medical unit at 0725" and at the hospital by 8:05 a.m.  *See id.*  The hospital notes that by 8:52 a.m., Plaintiff had returned from radiology and was "able to talk & laugh [with] correctional officers."  *Id.* at CCA00285.

Plaintiff asserts that the delay of several hours between the onset of pain and arrival at the emergency room by bus violates his Eighth Amendment rights because he was in the throes of a second heart attack.  However, he was not found to have suffered a heart attack that day.  The emergency room physician found "EKG – no new ?'s (changes)[.]  CR ? [.]  Cardiac enzymes – CK normal."  *Id.* at CCA00296. The emergency room doctor gave Pryce a prescription and wanted him to follow up with his cardiologist.  The physician released him back to the prison that afternoon. *See id.* at CCA00022, 243, 295-96.

In any event, as before, this is not a situation where prison officers or staff

ignored Plaintiff's symptoms.  He was taken to the medical unit, where he stayed for an hour while he as treated with nitroglycerine and aspirin and authorized to go the emergency room.  He arrived at the emergency room within forty minutes of leaving the prison without incident.  Based on how long the ambulance took to get to the hospital in 2005, the 2006 bus ride took twenty minutes longer.  For the same reasons as above, even assuming the objective prong has been met, I do not find any unconstitutional delay resulting in the substantial harm necessary to establish the subjective prong.

Therefore, I recommend that Claims 3 and 9 be dismissed.

Wherefore,

## IT IS HEREBY RECOMMENDED AS FOLLOWS:

1.    Plaintiff's eighth motion for appointment of counsel, *Doc. 88,* be DENIED;

2.    Any further motions for appointment of counsel by Plaintiff be STRICKEN FROM THE RECORD AFTER FILING;

3.    Plaintiff's motion to clarify, *Doc. 92,* be DENIED AS MOOT;

4.    Plaintiff's motion to construe the original Complaint to name Officer Burbanks, *Doc. 90,* be DENIED AS MOOT;

5.    Plaintiff's motion to supplement, *Doc. 89*, be DENIED;

6.    Plaintiff's  motion to withdraw his motion to amend, *Doc. 91,* be DENIED;

7.      Defendants' renewed motion to dismiss on exhaustion grounds, *Doc. 77,* be DENIED WITHOUT PREJUDICE;

8.      Plaintiff's motions to amend, *Docs. 26, 27, 80,* be DENIED;

9.      Defendants' motion for summary judgment, *Doc. 46,* be GRANTED; and

10.     All of the claims Plaintiff raises or seeks to raise be dismissed on the merits.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1).  **A party must file any objections with the Clerk of the District Court within the ten day period  if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE